**UNITED STATES of America,**
**Plaintiff,**

v.

**BANKERS' NATIONAL LIFE INSUR-**
**ANCE COMPANY et al.,**
**Defendants.**

**Civ. A. No. 1214–58.**

United States District Court
D. New Jersey.

Nov. 3, 1961.

David M. Satz, Jr., U. S. Atty., Trenton, N. J., by Raymond W. Young, Asst. U. S. Atty., North Bergen, N. J., for the Government.

McGlynn, Stein & McGlynn, by Roger H. McGlynn, Newark, N. J., for defendant Bankers Nat. Life Ins. Co.

WORTENDYKE, District Judge.

This action against a life insurance corporation to foreclose an alleged tax lien upon the interest of the insured named in each of three policies issued by the company, presents the question whether the insured had any ascertainable property in each of the policies to which the asserted lien could attach.

Jurisdiction is conferred upon the Court by 26 U.S.C. § 7403. The statutory conditions precedent to the institution of the action have been complied with. Tax liens are claimed to have arisen under 26 U.S.C. § 6321. There was due to the plaintiff from the taxpayer (insured) on May 12, 1952, the sum of $92,640.50. That amount became a lien in favor of the United States upon "all property and rights to property" of the taxpayer on May 4, 1950, when the constituent taxes were assessed by the Commissioner of Internal Revenue. The assessment list upon which the assessments appeared was received by the Collector of Internal Revenue at Brooklyn, New York, and he gave notice and made demand for payment thereof on May 15, 1950. The lien provided by 26 U.S.C. § 6321 was perfected upon the latter date. 26 U.S.C. § 6322.

Defendant insurer admits the issuance of the policies upon the taxpayer's life— No. 46802 in the amount of $10,000, No. 46803 in the amount of $10,000, and No. 55287 in the amount of $15,000—and that the insurer received notice of the asserted liens on July 7, 1950. The cash surrender values of the policies set forth in the complaint are denied by the insurer, which alleges that the policy provisions authorize the insured to change the beneficiary named in and to receive the cash surrender value of each policy. The insurer contends that the insured's right to receive the cash surrender value of each policy may not be exercised by a court or a creditor because the right is personal to the insured.

Section 3–F of each policy provides that if a premium thereon becomes overdue "a quarterly instalment of the annual premium * * * shall be charged against the policy as an automatic policy loan, with interest at the rate of five and one-half per cent per annum payable in advance, as long as the then loan value of the policy, including the cash value of any outstanding dividend additions thereto and any dividend deposit at interest arising from (the) * * * policy is sufficient to cover (the) * * * premium loan and all other indebtedness to the Company on account of (the) * * * policy." Accordingly, the insurer alleges that it was obligated by the foregoing policy provisions to make automatic premium loan advances which reduced the cash surrender values available to the insured and created an indebtedness by the insured to the insurer on that account prior to the commencement of this action. In the counterclaim annexed to its answer, filed December 19, 1958, the insurer discloses that the cash surrender values of the policies as of that date were as follows:

| | |
|---|---|
| Policy No. 46802 | $2,344.42 |
| Policy No. 46803 | 2,652.25 |
| Policy No. 55287 | 9,902.22. |

Seeking injunctive relief *pendente*, the insurer invokes the Court's determination of the cash surrender value of each policy, the respective rights of all parties therein, and the discharge of the insurer from all liability to any party respecting the cash surrender values of the policies. We are not concerned with the issues between the plaintiff and the individual defendants because they have become moot through mutual compromise.

At the pretrial conference it was stipulated that "upon an offer of compromise by the taxpayer on December 26, 1950, which was rejected by the Collector, there was an agreement for the suspension of the statutory period of limitations." This action was commenced on November 6, 1958.

From tabular schedules prepared by the insurer and received in evidence I find that, during the period from 9/20/50 to 9/20/61 the cash surrender value of policy No. 46802 and of policy No. 46803 increased from $2,452 to $5,528.35 each;

while the cash surrender value of policy No. 55287 increased from $7,620 to $22,500. Against the cash surrender value of each policy the insurer makes charge, for automatic premium loans and interest as follows:

Policy No. 46802    $3,653.83;
Policy No. 46803    3,240.14; and
Policy No. 55287    12,356.52.

The evidence presents two questions: (1) What was the insured's property right in the cash surrender value of each policy on May 15, 1950, when the Collector gave notice and demanded payment of the tax lien?

(2) Does the Government's lien attach to successive increments of the cash surrender value of each policy, without diminution by reason of the insurer's premium loans and interest accruals thereon?

The only oral testimony presented was that of the insurer's actuary, received over plaintiff's objection, which disclosed the procedure followed by the insurer in implementation of the automatic premium loan provisions of the policies. At the conclusion of the testimony the insurer moved to dismiss the complaint upon the grounds that (1) taxpayer had no property right in the cash surrender value of any of the policies to which a tax lien could attach; and (2) recognition of the tax liens claimed would deprive the insurer of property without due process of law, in violation of its rights under the Fifth Amendment, by reason of insurer's obligation under the policy contracts to make the premium loans and its right to charge insured's indebtedness therefor against the cash surrender values resulting therefrom.

That the insured taxpayer had a property right (chose in action) in and for the cash surrender value of each policy is without question in view of United States v. Bess, 1958, 357 U.S. 51, and cases cited at page 56 of that opinion, 78 S.Ct. 1054, 2 L.Ed.2d 1135. Although that property right in the cash surrender value of the policies is protected against creditors by New Jersey law (N.J.S.A. 17:34–29; Slurszberg v. Prudential Insurance Co., 15 N.J.Misc. 423, 192 A. 451; Middlesex County Welfare Board v. Motolinsky, 134 N.J.Eq. 323, 35 A.2d 463), "state law is inoperative to prevent the attachment of liens created by federal statutes in favor of the United States." Bess, 357 U.S. at page 57, 78 S. Ct. at page 1058. "Once a federal tax lien attaches to the insured's interest, of course, the Government, in a proper action joining the appropriate parties, can enforce the lien in the insured's lifetime and thereby recover the cash surrender value." Bess, 357 U.S. at page 57, footnote 2, 78 S.Ct. at page 1058. I conclude, therefore, that the Government acquired a federal tax lien upon the cash surrender value of each of the policies on May 4, 1950.

Does the lien which attached to the cash surrender value of each policy on May 4, 1950 automatically attach to the successive increments in cash surrender value of the policies which have accrued since that date? It is the contention of the insurer that by the terms of each of the policy contracts it became obligated, in the event of premium default, to credit the insured with each accruing premium and, having done so, to debit the insured with the amount of such automatic premium loan and with interest as it accrued upon the loan. The Government, on the other hand, insists that by reason of the provisions of section 6322 of the Code, the lien which attached at the time the tax assessment was made continues until the liability for the amount so assessed is satisfied or becomes unenforcible by reason of lapse of time. Each successive premium loan credit extended the effective life of the policy contract and increased the amount of its cash surrender value. The insurer's actuary testified that "the cash surrender value of a policy is the reserve that is accumulated by the insurance company, plus any dividend accumulations, and less any outstanding indebtedness." He explained that it was necessary for a life insurer to carry a reserve because the cost of the insurance was a function of age and in

writing insurance policies such as those involved in this litigation on a level premium basis, there results, in the earlier years of the policy, a collection of a premium in excess of the cost of the insurance; but in the later policy years, as the insured becomes older, the premium collected (which is in the same amount throughout the life of the policy) is less than the actual cost of the insurance. Out of the excess premium collections of the early policy years there is accumulated a reserve in the form of a liability of the company to the insured, out of which the difference between premium receipts and insurance cost for later years will be compensated for. The reserve for excess premium collection is merely a liability account on the books of the insurer in favor of the insured. At the time of a premium default, where a cash surrender value exists, the insured enjoys three alternative privileges: (1) that of taking the cash surrender value and relinquishing the policy; (2) that of applying the cash surrender value to the purchase of term insurance; and (3) that of applying the cash surrender value to paid up insurance. Where the insured has previously elected to avail himself of the automatic premium loan provision of the policy, such policy provision becomes operative automatically upon the occurrence of the premium default. The insurer does not maintain in specie a cash reserve reflecting the surrender value of a policy at any time. That value is determined by calculation based upon reference tables. In utilizing an automatic premium loan provision, no money passes, nor is any check drawn;—but the amount of the loan is debited on the books of the insurer against the policyholder. The cash surrender value of a particular policy is not reflected upon any of the insurer's records, but a total, aggregate reserve is calculated for all outstanding policies annually. Moreover, the total reserve account of the insurer is not considered to be reduced by the total amount of the outstanding policy loans, because that reserve, required by State law, is unrelated to the amount of policy loans outstanding. These figures are reflected in the insurer's annual financial statement, which does not distinguish between the amount of general policy loans and that of automatic premium loans outstanding as of the date of the report. Likewise, the statement's "interest payable" item contains no break-down between the two types of loans. An automatic premium loan is treated, says the actuary, as a withdrawal by the insured of a sum of money from a reserve maintained for his account by the insurer. The excess premium payments during the earlier policy years develop a reserve which is treated by the insurer in a manner similar to the treatment accorded by a savings bank to the deposits of its customers. The growing policy reserve resulting from the succession of premium payments is treated as moneys held in trust for the benefit of the policy holder and actually belonging to him. In effect, the granting of an automatic premium loan is an advance of money which the policy holder has deposited with the insurer to be held in trust for the benefit of the insured; and as automatic premium loans are made by the insurer to the insured, they are treated as debits against the excess premium trust fund belonging to the insured. If the amounts of the successive premium loans represent withdrawals of moneys standing to the credit of the insured with the insurer, no obligation would arise on the part of the insured to pay interest to the insurer upon the premium loans. On the other hand, if the premium loans constitute credits in favor of the insured against moneys which are the property of the insurer, an interest charge would be appropriate upon the amounts of the premium loans. The insurer insists that the making of each automatic premium loan to the insured by the insurer created an equivalent indebtedness of the insured to the insurer, the aggregate of which, together with interest accrued thereon, could be deducted by the insurer from the proceeds of the policy when it matured upon the death of the insured. Until that event occurred or until the policy previously lapsed, the cash surrender

value continued to increase. Consequently, since the Government achieved a continuing lien upon the insured's property right in the policy, that lien attached to each successive increment in the cash surrender value thereof, despite the successive increments accruing to the indebtedness of the insured to the insurer by reason of the premium loans.

Reversion to the Bess case, supra, reminds us that no State statute nor act or agreement *inter partes* can impair the priority of a Federal tax lien once it has attached to the property of a taxpayer. Having received notice of the claimed tax liens on July 7, 1950, with respect to the cash surrender value of each of the policies here involved, the insurer permitted the cash surrender value to increase with notice of the priority status of the lien, and continued to make premium loans whereby the cash surrender value was progressively increased. The Government deferred instituting proceedings for the foreclosure of its liens while the insurer continued to increase the cash surrender value of the policies upon which the liens continued to rest. The argument of the insurer that it was obligated by the terms of the policy to grant the automatic premium loans is met by the obvious right and opportunity which accrued to the insurer to obtain an adjudication of its rights and obligations in the light of the policy provisions and the impact of the Federal tax lien claims. Nevertheless, the insurer has seen fit to continue to participate in the enhancement of the value of the *res* to which the tax lien has attached.

The insurer contends that a refusal to recognize the amounts of the automatic premium loans as advances to the insured by the insurer of moneys from *funds held by the insurer in trust for the insured,* would amount to a taking of *property of the insurer* without due process of law, in violation of the Fifth Amendment to the Constitution of the United States. Similarly, the insurer contends that prohibition of or interference with the performance by the insurer of its obligation under the policy contract until the Government has obtained a foreclosure decree with respect to its tax lien is also a deprivation of due process within the purview of the same Amendment. No authorities are cited by the insurer in support of these contentions of unconstitutionality.

I conclude that the plaintiff is entitled, by virtue of its tax lien, to the total cash surrender value of each of the policies upon which the lien has been asserted, as of the date of the decree in this cause. Each successive payment or credit of premium has enhanced the amount of the cash surrender value of the policy, although many, if not all, of these premium credits were effected by way of premium loans. The chose in action, if any, arising in favor of the insurer against the insured upon the making of each premium loan may not be offset by the insurer against the Government's lien upon the enhanced cash surrender value of the policy. The insurer must assert its claim against the insured by way of an action in debt. If the so-called premium loans were actually advancements of insured's money, the resulting increase in cash surrender value would clearly be subject to the Government's lien. If, on the other hand, the premium credits were actually equivalent to loans of the insurer's money, they were made by it at its peril with notice of the Government's tax lien, the priority of which is unassailable.

The motion to dismiss the complaint is denied. Plaintiff is entitled to a decree of foreclosure of its tax lien upon the cash surrender value of each policy as of the date of such decree.

This opinion shall constitute the Court's findings of fact and conclusions of law in accordance with F.R.Civ.P. 52 (a), 28 U.S.C.

An order may be presented in conformity with the views herein expressed.